UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――――

STANLEY ALBERT PRICE,      )
                                       )
               Petitioner,      )     Case No. 1:10-cv-159
                                       )
v.                                  )     Honorable Paul L. Maloney
                                     )
MARY BERGHUIS,         )
                                     )     **REPORT AND RECOMMENDATION**
               Respondent.    )
_____)

           This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was tried in 2007 for the 1973 murder of Martin Brown, a 20-year-old college student. The prosecution's theory was the petitioner and an accomplice, Gary Allister Mason, both members of a radical black power organization, stabbed Brown to death on the campus of Michigan State University on March 11, 1973, because he was white. Petitioner (then known as Stanley Albert Price) was initially charged in 1973 with open murder, but all charges were dismissed at the preliminary examination for insufficient evidence. Petitioner was charged again with open murder by the Ingham County prosecutor in 2005, and sufficient evidence was found to bind him over for trial. Petitioner (known at the time of trial as Kumbi Salim) was tried before a jury in the Ingham County Circuit Court beginning on April 26, 2007. On May 16, 2007, the jury found petitioner guilty of the lesser-included offense of second-degree murder. MICH. COMP. LAWS § 750.317. On August 15, 2007, Circuit Judge James R. Giddings sentenced petitioner to a prison term of 25-to-40

years. After unsuccessfully challenging his conviction on direct appeal, petitioner brought this habeas corpus proceeding.

The *pro se* petition raises the following grounds for relief:

I. THE COURT OF APPEALS DECISION WAS CLEARLY ERRONEOUS BY FAILING TO FIND THE TRIAL COURT PIERCED THE VEIL OF JUDICIAL IMPARTIALITY INTRODUCING EVIDENCE UNFAVORABLE TO THE DEFENDANT-APPELLANT.

II. THE COURT OF APPEALS DECISION WAS CLEARLY ERRONEOUS BY FAILING TO FIND THAT TRIAL COUNSEL WAS INEFFECTIVE FOR NOT CHALLENGING A SUGGESTIVE PHOTO ARRAY WHERE THE DEFENDANT THE DEFENDANT [sic] WAS THE ONLY ONE WEARING ARMY FATIGUES.

III. THE DECISION OF THE COURT OF APPEALS WAS CLEARLY ERRONEOUS IN NOT REMANDING THE CASE TO THE TRIAL COURT FOR AN EVIDENTIARY HEARING ON WHETHER TRIAL COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING TO PRIVILEGED SPOUSAL TESTIMONY.

IV. THE DECISION OF THE COURT OF APPEALS THAT TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO CHALLENGE TESTIMONY OF DEFENDANT'S EX-WIFE REGARDING DOMESTIC VIOLENCE WAS CLEARLY ERRONEOUS AND WILL CAUSE MATERIAL INJUSTICE.

(Petition at ID# 11, docket # 1). Additionally, in a supplemental brief, petitioner raises the claim that he is actually innocent of the crime for which he was convicted. Respondent has filed an answer to the petition, arguing that the decision of the Michigan Court of Appeals affirming petitioner's conviction was not objectively unreasonable under the standards established by the Antiterrorism and Effective Death Penalty Act (AEDPA).

Chief Judge Paul L. Maloney has referred this matter to me for issuance of a report and recommendation on the petition pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules

Governing Section 2254 Proceedings in the District Courts.  After review of the record, I conclude that petitioner has not established grounds for habeas corpus relief and recommend that the petition be denied on its merits.

### Proposed Findings of Fact

**A.      Trial-Court Proceedings**

Petitioner was charged in October 2005 with open murder for the 1973 stabbing death of Martin Brown, a 20-year-old Michigan State University student.  The prosecution's theory was that petitioner, an MSU student, and Gary Allister Mason decided to commit a random act of violence against the first convenient white target that they encountered in the early hours of March 11, 1973.  Petitioner maintained that the prosecution failed to prove beyond a reasonable doubt that petitioner was present at the scene or was involved in the murder.

Because petitioner does not challenge the sufficiency of the evidence, a detailed recitation of the proceedings at trial is not necessary.  Rather, this report and recommendation will summarize the trial-court proceedings, to provide context for the claims of ineffective assistance of counsel asserted in the petition.

After jury selection, trial began in the Ingham County Circuit Court on April 26, 2007.[1]  In March of 1973, Andrea Gaines-McCarthy was a nursing student at MSU.  On March 11, 1973, at about 1:30 a.m., she was driving on campus, returning from her  boyfriend's house.  (TT I, 45).  She saw someone run out from the woods waving his arms.  (*Id.*, 48).  She stopped and rolled down her window.  The man asked her to call an ambulance.  (*Id.*, 49).  She got out of her car, and

---

[1] The trial-court proceedings are reflected in eleven transcripts, beginning with volume I, docket # 14.

the man lay on the ground. (*Id.*, 50). She observed that he was very pale. She saw a man and asked him to get some help from the police. (*Id.*, 52). A police officer appeared shortly thereafter. (*Id.*, 53).

The man whom McCarthy had flagged down was James Antwine, an MSU student. (TT I, 81). Mr. Antwine, a basketball player for the university, talked to the man on the ground. The man said that he had been stabbed. Antwine testified that the man was bleeding "profusely." (*Id.*, 82). After trying to help the man, Antwine went to a nearby dorm and called the police.

George Plummer, an MSU public safety officer, was the first officer to arrive on the scene. He was on routine patrol when he saw some activity near the Sparty statue and drove over there to see what was happening. (TT II, 135-36). He was told that a person had been stabbed and needed help. Plummer saw "a young fellow lying in the street in blood-soaked clothing." (*Id.*, 137). As the officer administered first aid, the man told him that he had been stabbed. The man was having difficulty breathing. (*Id.*, 138). Plummer asked the man who had done this to him. The man answered that it was "two black men wearing Army fatigues." (*Id.*, 139). Plummer contacted the dispatcher and asked for backup and an ambulance. (*Id.*, 139-40). The ambulance took the victim to the hospital. The ambulance driver, Officer William Wardwell, also heard the victim describe his assailants as two black men wearing military fatigues. (TT VI, 19). The victim, identified as Martin Brown, died at the hospital later that night.

Petitioner and Gary Allister Mason were both instructors for the Black Topographical Library and Research Center (BTLRC), an organization that prosecutors contended was a militant, black power group. Petitioner and Mason had conducted a meeting for the organization on the MSU campus on the evening of March 10, 1973. Christopher Hood, who had been a leader of the BTLRC

-4-

in 1973, testified that, to the contrary, the organization was an educational group whose mission was to educate the African-American community. (TT III, 73). He did concede, however, that the group engaged in what could be seen as "anti-white propaganda" (*Id.*, 92) and that the group's material included photocopies of "lynchings and hangings and burning." (*Id.*, 93). Hood confirmed that petitioner and Mason had been involved in the work of the BTLRC in March of 1973. (*Id.*, 84-86). Hood had authorized petitioner and Mason to conduct a class on the campus of MSU on March 10, 1973. (*Id.*, 93-94). Mason called at 9:30 or 10:00 in the evening to report that the class was over and that it went well. (*Id.*, 96-97). Hood confirmed that the members of the organization wore Army fatigues at the time. (*Id.*, 97-98).

Erik Johnson was on the Michigan State campus on March 10, 1973, to visit his girlfriend, Sue Forsland. He picked her up at her residence hall in the Brody Complex, and the two began walking toward the Red Cedar River at about 12:30 a.m. (TT II, 88-89). As they neared a bridge, they saw two African-American males "walking briskly." (*Id.*, 92). The men were walking towards the Sparty statue. (*Id.*, 95). The couple became alarmed and returned to the dorm. The next day, Forsland learned that police were looking for a blond-haired couple that had been standing on the bridge crossing the Red Cedar in the early morning hours. She and Johnson contacted with the police, because they met the description. (*Id.*, 96). Johnson was shown a photo array, from which he picked out petitioner as one of the men that he saw that night. (*Id.*, 95). On cross-examination, Johnson testified that the men he saw were wearing Army fatigues at the time. (*Id.*, 106).

Sue Anne Johnson (formerly Sue Anne Forsland) testified that she and her then-boyfriend Erik Johnson were walking toward the Sparty statue after midnight on March 10, 1973. (TT II, 112). They were on the bridge over the Red Cedar River at approximately 1:00 a.m., when

they saw two African-American men walking towards them at a fast pace. (*Id.*, 114-15). The next morning, she was told that someone was murdered that night and that the police were looking for a blond couple that had been standing near the bridge. (*Id.*, 116). They called the MSU police and were asked to look at photographs. (*Id.*, 116-17). She could not make a positive identification, but said that petitioner resembled one of the men that she had seen that night. (*Id.*, 120).[2]

Samuel Wolfson, an MSU student, saw a Volkswagen Beetle pull up in the Owens Hall parking lot at about 12:45 a.m. on March 11, 1973. (TT II, 46-47). He saw two men leave the vehicle. Wolfson identified petitioner in a photographic line-up on March 15, 1973, as the man who was driving the Volkswagen. (*Id.*, 53, 56). Wolfson had seen petitioner walking a number of times in the Brody Housing Complex, "so I didn't have any trouble recognizing him." (*Id.*, 50). The witness described petitioner as wearing full military fatigues. Wolfson did not recognize the other man who exited the car, but described him as dressed in the same fatigues as petitioner. (*Id.*, 49).

The prosecution also called John Demyer, an MSU student living in Holden Hall, who testified that he saw petitioner and a taller black man in an elevator at around 5:00 a.m. on March 11, 1973. (TT IV, 80-82). He described both men as wearing "Army jackets and pants and lace-up boots." (*Id.*, 82). Demyer called the police, because the men fit the description of individuals who may have had involvement in a murder. (*Id.*, 80).

The prosecution called William Handrich, who had been the Assistant Director of Holden Hall, where petitioner lived and served as a Black Student Aide. (TT IV, 126-27). Handrich

---

[2] On direct appeal, the Michigan Court of Appeals found that the photo array shown to Johnson and Forsland was suggestive, in that petitioner was the only person shown wearing fatigues. One of petitioner's habeas claims is that his counsel was ineffective for failure to seek suppression of the identification.

encountered petitioner in the Holden cafeteria at about noon. (*Id.*, 129). Everyone was aware of the murder by then. (*Id.*). Handrich asked petitioner whether he had heard about the murder. Petitioner answered, "A dude would have had to have been crazy to have stabbed somebody 10 times like that." (*Id.*, 130). Handrich reported the conversation to the police, because of petitioner's mention of the number of stab wounds. (*Id.*, 132). Officers took a written statement. (*Id.*, 135). Officer Henderson testified that at the time petitioner made that statement, the autopsy report was not yet returned and police had released no statement concerning the number of stab wounds. (TT V, 95-96). Detective James Dunlop, the lead detective on the case, testified that police had purposely decided not to release the number of stab wounds to the press: "At that point in time, we were keeping it to ourselves." (TT VII, 9-10).

During the initial investigation of the case, officers realized that the only car parked in front of the Jenison Fieldhouse, in the vicinity of the stabbing, was a beige Volkswagen Beetle, which officers surveiled throughout the night while they processed the crime scene. (TT III, 6). Officer Plummer testified that the officer watching the vehicle reported that it was moving at 6:30 a.m. Officer Plummer began to pursue it. (*Id.*, 7). Plummer stopped the vehicle for a turn-signal violation. The vehicle was driven by petitioner, who was dressed in Army fatigues. (TT II, 148). Plummer described petitioner's demeanor as argumentative and combative and stated that he was dressed in the uniform "described to me by the victim." (*Id.*). Petitioner was questioned at the police station. Petitioner told Henderson that he parked his car near Jenison Hall at 11:00 p.m. and then walked across campus to Fee Hall to visit a friend, Haywood Lockhart. (TT V, 17-19). He left Lockhart's at 4:00 a.m. (*Id.*). Petitioner was released from the police station.

Police interviewed Haywood Lockhart, who confirmed petitioner's alibi. (TT VI, 102). Police then interviewed Lockhart's roommate, Gregory Miller, who said that petitioner had not been in their room that night. (TT IV, 106). Police returned to Lockhart, who admitted that he lied. (TT VI, 103). He told officers that petitioner called him early in the morning, about 2:00 a.m., and asked Lockhart to meet him on campus to pick up his car at Jenison Fieldhouse. (*Id.*, 103-04). Gary Mason was with petitioner at the time. (*Id.*, 105). Lockhart met with petitioner and Mason, who asked him to tell anyone who asked "that they were with me all night." (*Id.*, 106).

Investigating officers ultimately learned that the parking permit on petitioner's car had been stolen. Petitioner was arrested on March 13, 1973, for receiving stolen property. (TT V, 21). Officer Harold Henderson of the MSU campus police approached petitioner with a warrant for his arrest. Petitioner said he was not going anywhere and resisted arrest, but was taken into custody. (TT V, 21-22). Officers read him his rights, and petitioner continued his belligerence. Petitioner initially repeated the same story that he had told Henderson during the interview on March 11, denying that he even knew Gary Mason and maintaining that he was with Lockhart on the night of the murder. (*Id.*, 37). Officer Henderson, however, confronted petitioner with the recantation by Haywood Lockhart concerning petitioner's alibi. Petitioner then changed his story. (*Id.*, 29-30).

Officer Henderson testified that on March 13, 1973, police searched petitioner's dorm room and retrieved a set of military fatigues. (TT V, 56-57). Police also saw the word "Marty," the name of the victim, written in ink on the wall beside the telephone. (*Id.*, 59). The next day, Henderson interviewed petitioner once more. During that interview, petitioner admitted to Henderson that he was "there," but that he did not stab anybody. (*Id.,* 54). Henderson testified that petitioner was nervous and seemed to be crying. (*Id.*).

-8-

Christopher Hood, who ran the BTLRC in Detroit, called police anonymously on April 2, 1973, to provide information concerning the murder. Hood described petitioner's Volkswagen and talked about Mason and Mason's brother. Hood indicated that he thought Mason was involved and that petitioner was present, but was not involved. (TT III, 111-17). He called police on the next day to give further information regarding the whereabouts of Gary Mason. (*Id.*, 116-17).

Two of petitioner's claims of ineffective assistance of counsel arise from the testimony of his former wife, Roberta Price. Petitioner and his former wife were married for over 22 years, but divorced about 1996. (TT V, 103). In the year 1989, during the time that they were married, Roberta Price called the Michigan State Police with information concerning the murder of Martin Brown. (*Id.*, 106). The reason for the call was that petitioner had hit her and that she was "fed up." (*Id.*, 106, 127). On direct examination at trial, Roberta Price was reluctant to acknowledge that she had implicated her husband during the 1989 telephone call. The prosecutor confronted her with police reports indicating that she told police that petitioner was involved in the murder. (*Id.*, 108-09). Roberta Price denied that those were her exact words. Later in the examination, the court asked her what she remembered saying to the police in 1989. Price responded: "I said he threatened to kill me and that he said he was going to kill me like he killed that student at Michigan State . . . ." (*Id.*, 119-20).

The prosecution called Bernard Burns, who was a police officer at Michigan State in 1989. Burns testified that he took the call from Roberta Price, after it was answered by someone else. Roberta Price told him that she knew who committed a homicide fifteen years earlier. (TT VI, 8). Burns asked, "Who was that?" and she answered, "My husband." (*Id.*). Mrs. Price told him that

her husband had just threatened to kill her and said "he would kill her just like he did that white boy at Michigan State, Martin Brown." (TT VII, 9-10). Mrs. Price told Burns that the knife her husband had used in the murder had been discarded in a sewer grate somewhere near the Brody Complex. (*Id.*, 10).

The prosecution presented incriminating testimony from a jailhouse informant, David Lee Allen, who met petitioner in the Eaton County Jail in 2005, when they were both awaiting trial. (TT VIII, 25-26). Allen learned that petitioner was facing trial in a "32-year-old murder case" and became interested. (*Id.*, 27). To gain petitioner's confidence, Allen falsely told petitioner that he was in for a manslaughter charge. His intent was to see if he could get petitioner to "open up to me" about his case. (*Id.*, 27-28). Allen testified that he was not working for the police at the time but was doing this out of his own curiosity. (*Id.*, 31). Petitioner confided in Allen that he was optimistic about getting bail, because his defense attorney went to school with the prosecutor and that both were black. (*Id.*, 29). When petitioner returned from his bond hearing, he was upset, because they switched prosecutors on him and "now he's got a f---ing white Prosecutor." (*Id.*, 30).

Allen testified that petitioner admitted details to him about petitioner's involvement in the death of Martin Brown. Before the bond hearing, he said that he had been extradited from Las Vegas and that a homeless man whose initials were GM had been extradited from San Diego. (TT VIII, 31). Petitioner told Allen that he was worried because he could not remember what he did with the Army fatigues that he had been wearing and was concerned that police could get DNA from his clothes 32 years later. (*Id.*, 31-32). Petitioner told Allen that he and GM were upset about the situation in Vietnam, because "white M_____F_____s" were coming back from Vietnam, but black people were staying over there and being brought back in body bags. Petitioner told Allen that he

and GM were out to "f--- with someone." (*Id.*, 32). He said that they saw a white boy walking and decided to go up and ask him for a light. The victim said that he did not have a light, and they "just started going off on him." Allen reported that petitioner said he was not the one who stabbed the victim but that petitioner held him, kicked him and punched him while GM stabbed him. (*Id.*, 33, 47). Allen testified that petitioner told him that after the stabbing petitioner ran one way and GM ran the other. (*Id.*, 32). Petitioner told Allen that his trial strategy was to deny that he even knew GM, because no one would believe a "homeless n____." (*Id.*, 33-34).

Allen also testified concerning conversations he had with petitioner after the bail hearing. During one such conversation, petitioner returned from court upset because he had learned that his ex-wife was testifying against him. "The bitch ratted on me." (TT VIII, 36). Petitioner told Allen that after he and his ex-wife had separated, petitioner had sent her money "to be quiet about this," but that petitioner had told his current wife that he had been sending the money for his children's college education. (*Id.*, 37). Allen claimed that petitioner wanted somebody to kill his former wife, "because he wasn't going to lose everything." He changed his mind, however, because he had a daughter and a son with her. (*Id.*, 38-39). The prosecution elicited other details of the relationship between Allen and petitioner that tended to show that petitioner shared details of his life with Allen while they were incarcerated together. (*Id.*, 40-42).

The prosecution established that Allen had been convicted of several felonies involving theft and that he was currently imprisoned on a conviction for false pretenses. (TT VIII, 25). Allen also conceded that he tried to work out a deal first through detectives and then through an Eaton County Circuit judge, to trade information about petitioner for favorable treatment on his

then-pending cases. (*Id.*, 43-44). He testified, however, that he had not been successful in receiving any benefit regarding any sentence. (*Id.*, 44).

The defense rested without calling any witnesses.

After final arguments, the court instructed the jury on both first and second-degree murder, and on the elements of aiding and abetting. (Final Arguments and Jury Instructions found in Volume X of Trial Transcript, docket # 24). On May 16, 2007, the jury returned a verdict of guilty on the charge of second-degree murder.

Petitioner and counsel appeared before Judge Giddings for sentencing on August 15, 2007. (Sentencing Transcript (ST), docket # 26). The court heard victim impact statements from family members of Martin Brown. Petitioner presented a long allocution, during which he did not deny committing the murder, but focused on his family and on the need for forgiveness. (ST, 23-27). After hearing from all parties, the court imposed a sentence of 25-to-40 years, the same sentence that the court had given Gary Mason, who had been convicted in an earlier trial.

### B. Appeal

Petitioner appealed as of right to the Michigan Court of Appeals, represented by new counsel. The appellate brief raised numerous allegations of trial and sentencing error:

I.  THE CONDUCT OF THE TRIAL COURT IN THIS MATTER INTRODUCING EVIDENCE AND CROSS EXAMINING WITNESSES UNDULY INFLUENCED THE JURY AND DENIED THE DEFENDANT HIS CONSTITUTIONAL RIGHT TO A FAIR AND IMPARTIAL TRIAL.

A.  The Court Acted As An Assistant Prosecutor In This Case Piercing The Veil Of Judicial Impartiality.

B.      The Court Disrupted The Trial Several Times Reiterating Points Which Were Unfavorable To The Defense And Introducing New Evidence For The Prosecution.

II.     DEFENSE COUNSEL'S CONDUCT IN THIS MATTER IN FAILING TO REQUEST EVIDENTIARY HEARINGS ON THE ISSUES OF THE DEFENDANT'S STATEMENTS AND THE PHOTO LINEUP OR TO MAKE BASIC EVIDENTIARY OBJECTIONS DENIED THE DEFENDANT EFFECTIVE ASSISTANCE OF COUNSEL.

A.      Defense Counsel's Failure To Request A *Walker* Hearing To Determine Whether Or Not Statements Made By The Defendant Were Voluntary Fell Below An Objective Standard Of Reasonableness.

B.      Defense Counsel's Failure To Request A *Wade* Hearing To Determine Whether The Photographic Array Used In This Case Was Unduly Suggestive Or To Object To Testimony From Witnesses Who Were Unable To Positively Identify The Defendant In the Array Fell Below An Objective Standard Of Reasonableness.

C.      Defense Counsel Was Ineffective For Allowing Privileged Communication To Be Introduced Against The Defendant Without Objection.

D.      Ms. Price's Testimony That Mr. Price Hit Her While They Were Married Was Irrelevant And Prejudicial And Should Have Been Excluded From The Trial, Defense Counsel Was Ineffective For Failing To Object To This Testimony.

E.      The Photographs Of Mr. Brown's Stab Wounds Should Have been Excluded As They Were Prejudicial And Had Very Little Probative Value.

F.      The Prosecutor's Opening Argument Was Inadmissible Where There Was No Evidence That The Stabbing In This Case Occurred Because of Mr. Brown's Race, Defense Counsel Was Ineffective For Failing To Object.

G.      Defense Counsel Was Ineffective For Failing To Insure That The Inadmissible Lay Testimony Of Christopher Hood Was Stricken From The Trial Record.

III.   THE ADMISSION OF EVIDENCE RELATING TO GARY MASON WAS
       REVERSIBLE ERROR AS THIS EVIDENCE WAS IRRELEVANT AND
       HIGHLY PREJUDICIAL.

IV.    THE SENTENCE IMPOSED IN THIS CASE WAS EXCESSIVE WHERE
       THERE WAS NO PHYSICAL EVIDENCE LINKING THE DEFENDANT
       TO THE STABBING, THE STABBING WAS COMMITTED THIRTY-
       SEVEN YEARS AGO, AND THE DEFENDANT HAD NO PRIOR
       CRIMINAL RECORD.

(Brief on Appeal of Defendant-Appellant at i-iii, found in Michigan Court of Appeals record, docket

# 27).

By unpublished, *per curiam* opinion issued March 17, 2009, the Michigan Court of

Appeals reviewed and rejected all claims for relief. *People v. Price*, No. 280835, 2009 WL 691774

(Mich. Ct. App. Mar. 17, 2009). The court first reviewed and rejected petitioner's claim that the trial

judge denied him a fair trial by questioning witnesses. The court reviewed the alleged instances of

judicial misconduct, finding that the court did not act improperly or reveal a bias in favor of the

prosecutor. The court noted that the questions of the trial court were designed to clarify the facts and

that the answers elicited were often as favorable to the defendant as they were to the prosecution.

The court further noted that at times questioning by the trial court was "imperative" in light of the

murkiness of some of the testimony elicited by counsel. *Id.*, at * 1 n.1.

With regard to the Sixth Amendment claims arising from counsel's failure to

challenge the voluntariness of defendant's statements to police or to challenge the photographic

array, the court applied the familiar *Strickland* standard. 2009 WL 691774, at * 3. The court found

counsel was not ineffective for failing to challenge the voluntariness of his statements. The court

noted that the record contained no indication that the statements were involuntary. "There was

police testimony, however, that defendant was fully informed of his constitutional rights, including

-14-

the right to an attorney, acknowledged his rights, indicated that he understood his rights, and was willing to speak to police on the subject of the murder and his whereabouts, even though he did not want to sign anything regarding his rights." *Id.,* at * 3. Reviewing the Sixth Amendment claim arising from the failure to seek suppression of the photograph lineup, the court determined that there was some evidence to support a conclusion that petitioner was the only one shown in fatigues and that skewing the array in this fashion represented "questionable police conduct." *Id.*, at * 4. The court concluded, however, that the fatigues alone did not make the array so impermissibly suggestive that it gave rise to a substantial likelihood of misidentification. Furthermore, the court discerned defense strategy in not objecting to the use of the questionable photo array, designed to assail the integrity of the prosecutor's case. "We are not prepared to rule that this strategy was constitutionally deficient." *Id.*, at * 4.

The appellate court then turned to petitioner's claim of ineffective assistance of counsel arising from failure to object to the testimony of petitioner's ex-wife regarding statements he made during the time of the marriage. Petitioner's appellate counsel argued that the testimony violated a privilege for marital communications created by Michigan statute. MICH. COMP. LAWS § 600.2162(7). The court found, as a matter of state law, that the statutory privilege belongs to the person examined, not to the defendant. As petitioner lacked standing to raise the objection, any objection would have been futile. 2009 WL 691774, at * 4-5. Reviewing petitioner's related challenge that counsel was ineffective for failing to object to his ex-wife's testimony regarding domestic violence, the court found that the testimony was admissible, as it was not offered to show petitioner's bad character, but to establish the context of her statement to police concerning petitioner's complicity in the crime. *Id.*, at * 2, 5. Rather than being harmful to petitioner, this

testimony tended to undermine the wife's credibility, as it established her motive to fabricate a false accusation against petitioner. *Id.*, at * 2.[3]

Petitioner sought leave to appeal to the Michigan Supreme Court. By standard order entered September 28, 2009, the Michigan Supreme Court denied discretionary review. *People v. Price*, 772 N.W.2d 409 (Mich. 2009).

Petitioner initiated this timely habeas corpus proceeding on February 19, 2010. The *pro se* petition raises the claim of judicial misconduct (claim I on appeal), as well as three of the Sixth Amendment claims asserted in the Michigan Court of Appeals (claims II.A, B and C on appeal). Additionally, by supplemental brief, petitioner attempts to raise a freestanding claim of actual innocence.

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 559 U.S. 766, 773 (2010). "AEDPA requires heightened respect for state court factual and legal

---

[3] The court also reviewed petitioner's other claims of error, which are not relevant here, because they are not included in his habeas corpus petition.

determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012)(*per curiam*). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1786-87 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Metrish v. Lancaster*, 133 S. Ct. at 1786-87; *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010).

**Discussion**

I.    **Actual Innocence**

After the Attorney General had filed his response to the petition, petitioner moved to amend the petition and to file a supplemental brief. (docket # 33). By order entered February 1, 2011 (docket # 34), the court allowed petitioner to file a new brief in support of his habeas corpus petition, but noted that the new, freestanding claim of actual innocence failed to state a claim for habeas corpus relief. To the extent that petitioner continues to claim that he is entitled to release from state custody because he is innocent of the murder charge (a claim never raised in the state courts), that contention fails to state a claim.

A claim of actual innocence is not itself a constitutional claim, but instead serves as a "gateway" through which a habeas petitioner must pass in order to have his otherwise barred constitutional claims considered on their merits. *See Herrera v. Collins*, 506 U.S. 390, 404 (1993). The Supreme Court has recently reaffirmed that it has never recognized a freestanding claim of actual innocence as a ground for habeas corpus relief, except possibly in death-penalty cases. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013). This is not a death-penalty case, and none of petitioner's substantive habeas claims are subject to procedural default or other bar, for which actual innocence, if proven, might act as a gateway. In these circumstances, petitioner's pursuit of habeas corpus relief on the basis that he is actually innocent of the crime fails to state a claim under section 2254(a). *See Cress v. Palmer*, 484 F.3d 844, 853-55 (6th Cir. 2007); *accord Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010).

Even if petitioner were able to seek habeas relief on his unexhausted claim of actual innocence, his supplemental brief fails to establish any basis for such a claim. A claim of actual

innocence must be supported by "new evidence" showing that it is more likely than not that no reasonable jury would have convicted petitioner. *See Schlup v. Delo*, 513 U.S. 298 (1995); *accord McQuiggin v. Perkins*, 133 S. Ct. at 1935. Petitioner presents no new evidence of any kind. Rather, his principal argument is that the district judge found the evidence against him insufficient at the preliminary examination in 1973, and that the 2007 verdict was based on recanted testimony that contradicted the earlier preliminary examination record. These matters were fully explored at trial. Petitioner's showing does not remotely resemble a viable claim of actual innocence.

## II.     Improper Questioning By Trial Court

The first claim in the habeas corpus petition is that the trial court "pierced the veil of judicial impartiality" by questioning witnesses. Examination of the state appellate record shows that petitioner's counsel did not cite a single federal case in support of this contention. Rather, counsel cited state appellate decisions examining such judicial conduct for abuse of discretion. The state court of appeals likewise cited only state law, concluding that the trial court's questioning of witnesses, although active, was not improper and did not deny petitioner a fair trial.

Under AEDPA, a federal court may grant a state prisoner's application for a writ of habeas corpus only if the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In this context, "clearly established law" signifies the holdings, as opposed to the dicta, of the United States Supreme Court. *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012). The district court may not base its decision on holdings of lower federal courts, let alone manufacture a new due-process right for the first time on habeas

corpus review. *See Parker v. Matthews*, 132 S. Ct. 2148, 2155-56 (2012); *Premo v. Moore*, 131 S. Ct. 733, 743 (2011). In the absence of a controlling holding of the United States Supreme Court, this court may not grant relief on a novel due-process claim.

Without question, the Due Process Clause of the Fourteenth Amendment requires that a criminal trial be presided over by an impartial decision maker. *See, e.g., Tumey v. Ohio*, 273 U.S. 510 (1927). The Supreme Court has held that due process is violated if the trial judge has a direct, personal, and substantial interest in the outcome of a case. *Id.* at 523. Due process also condemns a trial judge's "actual bias" against a defendant. *Bracy v. Gramley*, 520 U.S. 899, 905 (1997). Beyond this, however, habeas corpus relief cannot be granted on the basis of broad due-process principles. *See Carey v. Musladin*, 549 U.S. 70 (2006). Rather, a petitioner must be able to point to a holding of the Supreme Court and then demonstrate that the state-court decision was either contrary to that holding or was an unreasonable application of it. *See Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008); *accord Nevada v. Jackson*, 133 S. Ct. 1990, 1992-93 (2013)..

Petitioner has not done so in the present case, because the Supreme Court has never issued a holding imposing any restriction on the ability of a trial judge to question witnesses in a criminal case. The Michigan Rules of Evidence expressly empower the trial judge to examine witnesses, MICH. R. EVID. § 614(b), as do the Federal Rules, FED. R. EVID. 614(b). There is a general notion that this power should not be exercised in a way that makes the judge "an advocate," but the drafters' comments to the Federal Rules acknowledge that the "manner in which interrogation should be conducted and the proper extent of its exercise are not susceptible of formulation in a rule." FED. R. EVID. 614(b) (1972 advisory comm. notes). The lower federal courts address the issue as one of trial-court discretion, affirming the trial judge's general right to question witnesses

to clarify and develop the facts, but cautioning that the court should not display bias or infect the trial with the appearance of partiality. *See United States v. Ross*, 703 F.3d 856, 878 (6th Cir. 2012); *Freudeman v. Landing of Canton*, 702 F.3d 318, 328 (6th Cir. 2012).

The United States Supreme Court, however, has never articulated due-process standards governing this issue. Respondent cites the Supreme Court's decision in *Liteky v. United States*, 510 U.S. 540 (1994), as establishing principles relevant to this inquiry, but *Liteky* does not do so. The *Liteky* decision was rendered in a federal criminal prosecution and represents only a delineation of principles governing motions to disqualify federal trial judges brought under the disqualification statute, 28 U.S.C. § 455(a). The defendant in that case moved for recusal on account of certain statements and conduct of the trial judge, including the judge's questioning of witnesses. 510 U.S. at 542. The Court's decision was based solely on a determination of the requirements of the federal recusal statute; no constitutional principle was enunciated. Furthermore, the Court rejected all accusations of bias and did not even discuss, let alone enunciate a holding concerning, the questioning of witnesses.

Petitioner has never argued that the trial judge had an interest in the outcome of this case, nor has he ever alleged or established actual bias arising from an extra-judicial source. Rather, petitioner argues that the trial judge's questioning of witnesses stepped over some perceived constitutional line between proper and prejudicial judicial conduct. The United States Supreme Court has not issued decisions imposing constitutional limits on a state trial judge's ability to question witnesses at trial. Petitioner therefore fails the threshold inquiry under AEDPA, as he cannot demonstrate that the decision of the Michigan Court of Appeals is contrary to or represents an unreasonable application of, any specific United States Supreme Court holding. The state court

-21-

of appeals reviewed the trial judge's conduct for abuse of discretion, a matter not governed by the federal Constitution. To even entertain petitioner's first habeas corpus claim, this court would be required to fashion constitutional limitations from whole cloth, an exercise forbidden under AEDPA. Petitioner's challenge to his conviction on the basis of the court's questioning of witnesses must therefore be rejected.

### III.    Ineffective Assistance of Counsel

A.    Standards

Petitioner asserts that his Sixth Amendment right to the effective assistance of counsel was abridged by three serious errors made by his defense attorney: failure to seek suppression of a suggestive photo array shown to Erik Johnson and Sue Anne Forsland; failure to object to allegedly privileged spousal testimony; and failure to challenge the testimony of his ex-wife regarding domestic violence. The Michigan Court of Appeals decided all these Sixth Amendment claims on their merits, applying the federal standard adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.*

(citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). On the prejudice prong, the court focuses on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "[T]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because the Court of Appeals decided petitioner's claims of ineffective assistance of counsel on their merits, its decision must be afforded deference under AEDPA. *See Burt v. Titlow*, 134 S. Ct. 10, 15-16 (2013); *Harrington v. Richter*, 131 S. Ct. at 784. To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Hodges v. Colson*, 727 F.3d 517, 534 (2013). "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*). The question before the habeas court is "whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Premo v. Moore*, 131 S. Ct. 733, 740 (2011); *see Ballinger v. Prelesnik*, 709 F.3d 558, 563 (6th Cir. 2013).

B.      Failure to Seek Suppression of Suggestive Photo Array

Petitioner argues that his counsel was ineffective for failure to seek an evidentiary hearing challenging identification testimony resulting from allegedly suggestive police procedures. Petitioner's appellate counsel argued that in the photo array shown to Erik Johnson and Sue Anne Forsland petitioner was the only person depicted in Army fatigues. The prosecution disputed this, but the appellate court found evidence to support this contention. In light of the common knowledge that the suspects were wearing Army fatigues, the court found that petitioner met the first prong of the federal standard, which requires a showing that the array was impermissibly suggestive. *See Neil v. Biggers*, 409 U.S. 188, 198 (1972). The court found that petitioner did not meet the second prong of the federal test, in that the fatigues alone did not make the array so suggestive that it gave rise to a substantial likelihood of misidentification. The court therefore found that a challenge would have been futile. The court also noted that petitioner failed to overcome the strong presumption that counsel's choice not to challenge the photo array constituted sound trial strategy, noting that defense counsel used the questionable photo array and the emphasis on Army fatigues to assail the credibility of the prosecution's case. 2009 WL 691774, at * 4.

Under the doubly deferential standard of review required by AEDPA, habeas corpus relief is available to petitioner on this ground only if this decision of the Michigan Court of Appeals was objectively unreasonable. Petitioner's showing falls far short of satisfying this heavy burden. Even assuming the impropriety of showing petitioner as the only suspect in fatigues, and that counsel

therefore should have objected, it is virtually inarguable that petitioner was prejudiced under the *Strickland* standard. Sue Anne Forsland did not even make a positive identification on the basis of the photo array, but merely testified that petitioner resembled one of the men that she had seen that night. (TT II, 120). A criminal defendant is hardly prejudiced by such inconclusive testimony. Erik Johnson did pick petitioner out of the photo array. (*Id.*, 95). But he was not the only witness to place petitioner at the general scene of the crime. By the time of trial, it was virtually undisputed that petitioner was in the general vicinity of the crime in the early morning hours of March 11, 1973. Samuel Wolfson saw petitioner and another man parking petitioner's car at about 12:45 a.m. that night. Wolfson had seen petitioner walking a number of times in the Brody Housing Complex, so he had no trouble recognizing him. (TT II, 50). Petitioner's car was the only car parked near the Jenison Fieldhouse that night, and petitioner admitted to officers during his first interview (conducted before police talked to Johnson and Forsland) that he had parked his car near Jenison at about 11:00 p.m. (TT V, 17-19). The testimony of Erik Johnson was therefore cumulative and served only to place petitioner on the northwest part of campus, more than an hour before the crime. At best, these identifications were cumulative evidence on a virtually undisputed point. Consequently, petitioner cannot show the existence of a reasonable probability that, but for counsel's failure to seek suppression of the identification, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694.

C.     <u>Failure to Object to Privileged Testimony</u>

Petitioner next contends that counsel was ineffective for failing to object to the testimony of his former wife, which he contends was privileged by virtue of Michigan statutory law:

> Except as otherwise provided in subsection (3), a married person or a person who has been married previously shall not be examined in a criminal prosecution as to any communication made between that person and his or her spouse or former spouse during the marriage without the consent of the person to be examined.

MICH. COMP. LAWS § 600.2162(7). This statute creates an evidentiary privilege known in Michigan law as the "marital-communications privilege." *See People v. Dolph-Hostetter*, 664 N.W.2d 254, 255 n.1 (Mich. Ct. App. 2003). On direct appeal, the Michigan Court of Appeals held that on the face of the statute, the privilege belongs to the person examined, not the defendant in a criminal case. Therefore, petitioner's counsel had no valid objection on the basis of the marital-communications privilege, which belonged to petitioner's former wife, and not to him. 2009 WL 691774, at * 4-5.

The first necessary showing under *Strickland* is that counsel was constitutionally ineffective for failing to object to the allegedly privileged testimony. An attorney cannot be deemed ineffective for failing to raise a meritless objection. *See Kittka v. Franks*, No. 12-1919, ___ F. App'x ___, 2013 WL 5227043, at * 5 (6th Cir. Sept. 18, 2013); *Milstead v. Sherry*, 525 F. App'x 323, 326 (6th Cir. 2013). The validity of the objection in this case is governed by Michigan law, as the marital-communications privilege is a creature of state statute. Relying on previous Michigan cases, the Court of Appeals held on direct appeal that petitioner had no valid objection on the basis of the statutory privilege, which belongs to the spouse, not the criminal defendant. On habeas corpus review, this court is bound by such determinations of state law announced by an appellate panel on direct review. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). As the state courts have definitively ruled that any objection would have been meritless, counsel cannot be deemed ineffective for failing to assert a statutory privilege that belonged to the witness and not to petitioner himself.

D.      Failure to Object to Testimony of Ex-Wife

Petitioner's final claim of ineffective assistance of counsel arises from counsel's failure to challenge the testimony of petitioner's ex-wife regarding domestic violence. Petitioner asserts that this testimony constituted "bad acts" evidence excludable under Mich. R. Evid. 404(b). On direct review, the Michigan Court of Appeals determined that the testimony was not excludable, because the purpose of the testimony was not to show that "defendant was a person of bad character who was thus more likely to have committed the murder, *i.e.*, criminal propensity evidence." 2009 WL 691774, at * 2. The court observed that the evidence was presented to give the jury relevant information regarding the dynamics of petitioner's relationship with his ex-wife, thereby providing context to her statement to police concerning petitioner's incriminating remarks made in 1989. Further, the testimony was not prejudicial, but assisted petitioner, as it tended to undermine the credibility of his ex-wife's testimony, in that it established a motive for her to fabricate, namely, vindictive feelings toward petitioner arising from the history of physical abuse. *Id.*, at * 2. Any objection would therefore have been futile, as the testimony was not offered solely to establish criminal propensity, but for another legitimate purpose.

On habeas corpus review, this court is bound by the determination by the Michigan Court of Appeals on direct review that the testimony concerning previous physical abuse was admissible under state law. *See Bradshaw*, 546 U.S. at 76. This precludes petitioner's claim of ineffective assistance of counsel, as counsel cannot be deemed constitutionally ineffective for failing to raise an objection to admissible evidence.

**Recommended Disposition**

The decision of the Michigan Court of Appeals rejecting petitioner's four habeas corpus claims on direct review was objectively reasonable and therefore entitled to deference under AEDPA. Petitioner has failed in his burden to show that the decision of the Michigan Court of Appeals was contrary to or represented an unreasonable application of federal law, as enunciated in holdings of the United States Supreme Court. Petitioner's "supplemental" claim of actual innocence fails to state a claim for habeas corpus relief. I therefore recommend that the petition be denied in its entirety on the merits.


Dated:   January 13, 2014          /s/  Joseph G. Scoville
                                   United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).